AO 106 (Rev. 06/09) Application for a Search Warrant

ATK
for
AUSA Loo
5/30/19

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAY 31 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____MC_____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.
A white Apple iPhone; Serial No. FK1Y2J93HFLQ; )
IMEI No. 35 568707 414157 8 )   **19MJ9626**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 and 963 | Importation of controlled substances and conspiracy to do the same |

The application is based on these facts:
See Affidavit of HSI Task Force Officer Margarita Carter, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Margarita Carter, HSI TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 31, 2019

*Judge's signature*

City and state: San Diego, CA                Hon. Andrew G. Schopler, Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED
(Collectively, the "Target Devices")

A white Apple iPhone
Serial No. FK1Y2J93HFLQ
IMEI No. 35 568707 414157 8
(found on Rafael Gonzalez's person)

A black Motorola e5 plus smartphone
Serial No. ZL5225CHC7
IMEI No. 354138090618620
(found in Rafael Gonzalez's vehicle)

The Target Devices are currently in an evidence vault located at 2051 North Waterman Ave., Suite 100, El Centro, California 92243.

## ATTACHMENT B

### ITEMS TO BE SEIZED

*APPLICATION*
*WHITE APPLE iPHONE*

Authorization to search the cellular phones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular phone for evidence described below. The seizure and search of the cellular phone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular phone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of November 28, 2018, up to and including February 28, 2019:

*DATE NOT APPROVED IN WARRANT. AGS*

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**



# AFFIDAVIT

I, Margarita Carter, Task Force Officer, being duly sworn, state as follows:

## INTRODUCTION

1. I submit this affidavit in support of applications for warrants to search the two cell phones described in Attachment A (collectively, the "Target Devices") and seize evidence of crimes, specifically violations of 21 U.S.C. §§ 952, 960, and 963.

2. The requested warrants relate to the investigation and prosecution of Rafael Gonzalez ("Defendant"). Defendant is charged with conspiring to import approximately 207.18 grams (0.45 pounds) of methamphetamine in the Southern District of California (Case No. 19-CR-1497-JLS). The **Target Devices** were seized from Defendant's pocket and car around the time of Defendant's arrest at the Calexico, California West Port of Entry. The **Target Devices** are currently in an evidence vault located at 2051 North Waterman Avenue, Suite 100, El Centro, California 92243.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as set forth in greater detail in Attachment B.

4. The information contained in this affidavit is based upon my experience, training, and consultation with other law enforcement agents. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation.

5. Based upon my training, experience, and the information set forth in this affidavit, I believe the following items will be found in the **Target Devices**:

   a. Telephone numbers or identities assigned to the device, including usernames and passwords and electronic mail addresses;

   b. Call history information, including Internet Protocol (IP) addresses accessed by the device or accessing the device;

   c. Stored photographs, videos and text messages;

d. Stored electronic mail, including attachments, and voice messages and other recordings;

e. Web-browsing history and any stored web pages;

f. Stored documents and other files;

g. Stored geo-location information; and,

h. Data stored in any application.

These items may constitute or may lead to evidence of drug trafficking in violation of Title 21, United States Code Sections 952, 960, and 963.

## BACKGROUND

6. I am a U.S. Customs and Border Protection Enforcement Officer, and have been since 1996. I am currently a Task Force Officer with Homeland Security Investigations, and have served in that capacity since January 2018. I also previously served as a TFO with the Drug Enforcement Administration from October 2011 to March 2016.

7. I am a graduate of the U.S. Customs Officer Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and the Customs and Border Protection Advanced Training Center in Harpers Ferry, West Virginia.

8. I have participated in numerous narcotics-related investigations. In addition, as a result of my training, experience, and consultations with other law enforcement officers, I have become knowledgeable regarding the methods, language, and patterns of narcotics traffickers. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals by utilizing cellular phones to maintain communications with co-conspirators. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence, including, but not limited to, cellular phone-related evidence, such as text messages. With regard to drug importation cases, for example, persons smuggling controlled substances across the United States/Mexico border are often in contact with co-conspirators around the time of the crossing of the drugs for purposes of receiving instructions or updating the conspiracy on their status.

9. Based upon my training, experience, and consultations with other law enforcement officers, I submit the following:

    a. Drug traffickers will use cellular phones because they are mobile and permit ready access to phone calls and text, web, and voice messages.

    b. Drug traffickers will use cellular phones because they are able to actively monitor the progress of their illegal cargo while in transit.

    c. Drug traffickers and their accomplices will use cellular phones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers will use cellular phones to coordinate a drop off and/or pick up time for their illegal cargo.

    e. Drug traffickers will use cellular phones to notify or warn their accomplices of law enforcement activity, including the presence of law enforcement officers, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers will use cellular phones to communicate with persons who transport their narcotics and/or drug proceeds.

10. Additionally, based upon my training and experience, I know that cellular phones can and often do contain electronic evidence, such as emails, text messages, chat logs, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular phone. Specifically, searches of cellular phones often yield evidence:

    a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

3

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On February 28, 2019, at approximately 8:15 a.m., Nancy Vargas, Defendant's co-defendant, applied for entry into the United States from Mexico via the pedestrian lane at the Calexico West Port of Entry. Ms. Vargas was referred for further inspection, and during a pat down CBP Officers discovered two packages hidden on Ms. Vargas' body that contained a white, crystal-like substance. Ms. Vargas was asked if she knew what was in the packages, and she replied, "Yes, methamphetamine." Ms. Vargas was placed under arrest and the contents of the packages were field-tested. The packages had a combined weight of 207.18 grams and field-tested positive for methamphetamine.

12. Ms. Vargas was subsequently read her *Miranda* rights and she agreed to answer questions without an attorney present. Ms. Vargas stated that she smuggled the methamphetamine at the direction of Defendant, and that she was supposed to be paid $700, if successful. According to Ms. Vargas, she met Defendant earlier, and Defendant drove her to Mexicali twice—once on February 25 and once on February 27, 2019. During the February 27 trip, Defendant drove Ms. Vargas to the Calexico West Port of Entry and then they both crossed on foot to Mexico. In Mexico, they met with an unidentified male who gave Defendant some money and some methamphetamine. Defendant then packaged the methamphetamine and gave it to Ms. Vargas. Afterwards, Defendant and Ms. Vargas

returned separately to the United States and Ms. Vargas was arrested at the Calexico West Port of Entry.

13. Defendant was arrested near his vehicle at the Calexico West Port of Entry, and the **Target Devices** were found on Defendant's person and in his car at the time of his arrest. Defendant was read his *Miranda* rights, and agreed to speak to agents without an attorney present. Defendant admitted to knowing that he was transporting Ms. Vargas to smuggle narcotics from Mexico into the United States.

14. Based upon my training, experience, and investigation in this case, I believe that Defendant was involved in an ongoing conspiracy to import methamphetamine. Through my training, experience, and consultations with other law enforcement officers, I am aware that narcotics trafficking conspiracies frequently require planning to successfully evade detection by law enforcement, including planning and coordination in the days and weeks prior to a drug smuggling event. Additionally, co-conspirators are often initially unaware of a subject's arrest and will continue to attempt to communicate with a subject after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, individuals such as Defendant will also attempt to minimize the amount of time they were involved in their drug smuggling activities, and may be involved for weeks and months longer than they claim. Given those facts, I respectfully request permission to search the **Target Devices** for data beginning on November 26, 2018, up to and including February 26, 2019.

## METHODOLOGY

15. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers

5

now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

16. Following the issuance of these warrants, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrant.

17. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

18. Based on all of the facts and circumstances described above, there is probable cause to conclude that Defendant used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

19. Because the **Target Devices** were promptly seized during the investigation of Defendant's drug trafficking activities and have been securely stored, there is probable

cause to believe that evidence of illegal activities committed by Defendants continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for the searches is from November 28, 2018, up to and including February 28, 2019.

20. For the above reasons, I request that the Court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*[signature]*

Margarita Carter, Task Force Officer
Homeland Security Investigations

Subscribed and sworn to before me this 31st day of May, 2019.

*[signature]*

Hon. Andrew G. Schopler
United States Magistrate Judge

7